IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| STANLEY BENTON, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : CASE No.: 1:12-CV-185 (LJA) |
| | : |
| CRANE MERCHANDISING SYSTEMS, INC., | : |
| | : |
| Defendant. | : |
| | : |

## **ORDER**

Before the Court is Defendant Crane Merchandising Systems, Inc.'s Motion for Summary Judgment and Motion to Strike Portions of the Affidavit of Stanley Benton. (Docs. 74, 80). For the reasons articulated below, Defendant's Motion for Summary Judgment, (Doc. 74), is **GRANTED** and Defendant's Motion to Strike, (Doc. 80), is **DENIED**.

## **PROCEDURAL BACKGROUND**

On March 20, 2012, Plaintiff filed a charge against Defendant with the Equal Employment Opportunity Commission ("EEOC"), alleging, *inter alia*, unlawful discrimination based on an actual or perceived disability, a failure to promote, and retaliation under the Americans with Disabilities Act, ("March EEOC Charge"). (Doc. 72-14). On October 18, 2012, Plaintiff filed a second charge against Defendant with the EEOC, also alleging, *inter alia*, unlawful discrimination based on an actual or perceived disability and retaliation for filing the March EEOC Charge under the Americans with Disabilities Act, ("October EEOC Charge"). (Doc. 72-15).

On December 5, 2012, Plaintiff initiated this action by filing a Complaint. (Doc. 1). On June 19, 2013, Plaintiff filed an Amended Complaint claiming discrimination based on his disability or perceived disability and retaliation for filing his March EEOC Charge, in

1

violation of the Americans with Disabilities Act, as amended, 12 U.S.C. § 12101, *et seq.*, ("ADA"). (Doc. 28). On December 2, 2013, Defendant filed an Answer to Plaintiff's Amended Complaint. (Doc. 40). On May 26, 2015, Defendant filed a Motion for Summary Judgment on all of Plaintiff's claims and seeking a grant of reasonable costs and attorneys' fees. (Doc. 74). On July 6, 2015, Plaintiff responded. (Docs. 77, 78). On August 6, 2015, Defendant replied. (Doc. 81). Accordingly, Defendant's Motion for Summary Judgment, (Doc. 74), is now ripe for review. *See* M.D. Ga. L.R. 7.3.1(a).

## FACTUAL BACKGROUND[1] [2]

### I. Plaintiff's Employment History with Crane

Defendant's business includes manufacturing and servicing vending machine equipment. (Doc. 74-1 ¶ 1). Plaintiff is currently employed as a field service engineer, ("FSE"), in Defendant's office in Bainbridge, Georgia. (*Id.* ¶ 2; Doc. 78-1 ¶¶ 177, 178). Plaintiff began his employment in or about June, 1999. (Docs. 74-1 ¶ 2; 78-1 ¶ 177). During his tenure, Plaintiff has worked with two direct supervisors. Mike Cano supervised Plaintiff from 2006 until approximately 2011. (*See* Doc. 78-1 ¶ 193). Since January 2011, David Melvin has directly supervised Plaintiff. (Doc. 74-1 ¶ 3). Melvin also directly supervises five other FSEs. (*See id.* ¶ 4). Melvin reports directly to Service Manager Peter Whitney. (*See id.* ¶ 6; 78-1 ¶ 179). Under the heading "Functions of the Job" in the FSE job description, the following subsections are included: "Essential Functions" and "Physical/Visual Activities or Demands." (Docs. 74-1, 72-1). As provided in the "Essential Functions" section, FSEs are

---

[1] The relevant facts are derived from Plaintiff's Amended Complaint, (Doc. 28), Defendant's Answer to Plaintiff's Amended Complaint, (Doc. 40), Defendant's Motion for Summary Judgment and Statement of Undisputed Material Facts, (Docs. 74, 74-1); Defendant's Memorandum of Law in Support of Motion for Summary Judgment, (Doc. 74-2), Plaintiff's Amended Response in Opposition to Defendant's Motion for Summary Judgment, (Doc. 78), Plaintiff's Amended Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, (Doc. 78-1), Defendant's Reply in Support of Motion for Summary Judgment, (Doc. 81) and Defendant's Objections to Plaintiff's Statement of Material Facts, (Doc. 82). Where relevant, this factual summary also contains undisputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in the light most favorable to the non-moving party. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[2] Defendant has moved separately to strike paragraphs 12, 20, 23, 33, and 41 of Plaintiff's Affidavit, (Doc. 76-11), which Plaintiff filed in support of its opposition to Defendant's Motion for Summary Judgment. (Doc. 80). Upon review, while the Court finds that some of the statements in Plaintiff's Affidavit are arguably incomplete, conclusory, or contradictory, the Court has independently reviewed the factual record and has not relied on any Party's statement which it deemed incomplete, conclusory, or contradictory in ruling on Defendant's Motion for Summary Judgment. (Doc. 74). Accordingly, Defendant's Motion to Strike Portions of the Affidavit of Stanley Benton, (Doc. 80), is **DENIED**.

required to "[c]onduct paid service call, as required" and "[s]chedule customer visits based on actual customer need." (*Id.* at 1).  The "Physical/Visual Activities or Demands" requires that FSEs be "[c]apable of driving a company owned vehicle for extended periods." (*Id.* at 2).  Qualifications for the FSE position also include a requirement that the FSE have experience managing a "large geographical territory" with overnight travel. (*Id.* at 2).  As an FSE, Plaintiff installs and repairs new equipment, and does paid service calls to repair old equipment. (*See* Doc. 74-1 ¶ 13).  Additionally, Plaintiff trains customers to operate vending machines, and to perform basic maintenance and service on the machines. (*Id.* ¶¶ 14, 15).  Although Plaintiff's supervisors may instruct him on which customers to visit if there is a specific need, Plaintiff typically sets his own schedule. (*Id.* ¶ 27).  According to Plaintiff, "driving is part of the job, as there would be no other realistic mode of transportation to visit Plaintiff's customer and client locations." (Doc. 78-1 ¶ 180).  According to Plaintiff, "[g]enerally, FSEs, including [himself], travel Monday through Thursday, and complete paperwork on Fridays." (*Id.* ¶ 20).  Due to travel demands, Mike Cano, one of Plaintiff's former supervisors, does not believe that the FSEs workload can be completed in a 40 hour work week. (Doc. 74-1 ¶ 22).  Peter Whitney estimated that FSEs work between 45-55 hours per week. (*Id.* ¶ 23).  Plaintiff estimates that he works between 50-60 hours each week. (Doc. 78-1 ¶ 24).

FSEs are hired to cover a particular territory. (Doc. 74-1 ¶ 31).  Plaintiff's territory currently includes Georgia, Alabama and North Florida. (*Id.* ¶ 36).  When Plaintiff first began working for Defendant, his territory only included Central and North Florida. (*Id.* ¶ 32).  In 2007, upon the departure of FSE Don Seay, Plaintiff took over Seay's territory, which included Georgia, Florida, and Alabama. (*Id.* ¶¶ 33, 34).  According to Plaintiff, although his territory has included Georgia and Alabama since 2007, three subsequent changes have resulted in him also covering the Florida panhandle, all of Florida north of Interstate 10, and all of north Florida south to Gainesville. (Doc. 78-1 ¶ 37).  Defendant denies that Plaintiff's territory changed after 2007. (Doc. 74-1 ¶ 37).  According to Plaintiff, he does not have the ability to handle a larger territory because of his disability resulting

from a car accident in March, 2000, and because he does not want a territory assignment further away from his home.  (*See* Doc. *Id.* ¶ 40).

## II.     March 2000 Car Accident

In March 2000, while employed by Defendant, Plaintiff was in an automobile accident ("2000 car accident" or "car accident").  (*Id.* ¶ 82).  Since the 2000 car accident, Plaintiff has been treated by four doctors: Dr. Chris Rumana, Dr. David Seaton, Dr. Jeffrey Landau, and Dr. Kirk Mauro.  (*See id.* ¶¶ 84, 85).  Shortly after the car accident, Dr. Rumana performed surgery on Plaintiff.  (*Id.* ¶ 86).  In or about July 13, 2000, Dr. Rumana rated Plaintiff as having a 14% whole body disability rating and released Plaintiff back to work.  (*See id.* ¶ 87; Doc. 78-1 ¶ 183).  In 2000, Plaintiff stopped seeing Dr. Rumana and became a patient of Dr. Mauro.  (Doc. 74-1 ¶ 88).  Since 2000, Plaintiff has visited Dr. Mauro at least three times per year.  (*See id.* ¶ 89; 78-1 ¶ 89).  Generally, immediately after a patient visit, Dr. Mauro dictates his office notes to an assistant in order to document the visit and his evaluation of the patient.  (Doc. 74-1 ¶ 92).  In notes dated January 11, 2011, April 11, 2011, September 12, 2011, and March 29, 2012, Dr. Mauro reported that Plaintiff had no medical restrictions on performing his job or engaging in daily life activities.  (*Id.* ¶ 95-99).  In 2000, Dr. Seaton diagnosed Plaintiff as having post-traumatic stress disorder ("PTSD") as a result of the 2000 car accident.  (*Id.* ¶¶ 109, 111).  In 2011, Dr. Landau also diagnosed Plaintiff as having PTSD based on the 2000 car accident.  (*Id.* ¶¶ 110, 111).

According to Plaintiff, since the 2000 car accident, he suffers from nerve damage and pain in his neck, shoulder, and arms.  (Doc. 78-1 ¶ 184).  Plaintiff has also been taking pain medications since the 2000 car accident.  (*See* Docs. 74-1 ¶ 112; 78-1 ¶ 187).  In September, 2012, Tramadol, Robaxin, and Soma were among the pain medications Plaintiff was taking.  (Doc. 74-1 ¶ 116).  Tramadol and Robaxin can make a patient feel "loopy, confused, or groggy."  (*Id.* ¶ 119).  Soma makes Plaintiff feel drowsy.  (Doc. 78-1 ¶ 117).  On September 18, 2012, Dr. Mauro prescribed, and Plaintiff began taking, a new drug, called Gralise, (Doc. 74-1 ¶ 115).  Gralise made Plaintiff feel drowsy or dizzy.  (Doc. 78-1 ¶ 117).  Plaintiff read the descriptive drug insert for Gralise that Dr. Mauro provided him and understood that the

4

most common side effect of the medication is dizziness. (Doc. 74-1 ¶ 121). Plaintiff also spoke to Dr. Mauro about the side effects of Gralise and understood that taking it with certain medications could make him sleepy or dizzy. (*See id.* ¶ 125). According to Plaintiff, he stopped taking Gralise when he realized that it made him feel drowsy. (Doc. 78-1 ¶ 122). Prior to September 28, 2012, Mr. Melvin occasionally received emails or work summaries from Plaintiff informing him that Plaintiff would miss work because of neck and shoulder pain and that Plaintiff was taking medicine that prevented him from driving. (*See* Doc. 70 at 60:8-19).

### III.  September 28, 2012 Fall

On Friday, September 28, 2012, Plaintiff sent the following email to Melvin:

> I made it home early this afternoon after a long stressful week working about 54 hours. I had to take my medication this morning as it was impossible for me to drive or function without it. As you may recall, my medication makes me dizzy and drowsy. I arrived home successfully, however I was unloading my van this afternoon and I slipped and fell, my back caught the sliding door on the driver's side of the van. This hurt so badly that I laid in the yard for about 5 minutes. Natalie came outside and had to help me up and got me in the house and on to the couch. My back is in extreme pain and I am debating on whether to try to go to the emergency room or not, I think I am going to try to hold out as I have an appointment with my doctor on Tuesday. I will try to work on my paperwork and review over the weekend. I am having difficulty sitting up due to my back but will try to work on it in short stints over the weekend as tolerated. I will keep you posted if I am not able to get it done.
>
> I would also like to discuss with you the new territory assignments. As you know my health has continued to deteriorate over the last couple of years and I have really struggled to keep up with my duties and my current territory and customers. Dr. Mauro has prescribed me some new pain medication that makes me very loopy feeling which may have caused the fall that's referenced above. I have to eat pain pills constantly to keep up with my current schedule and it has really taken a toll on me physically and mentally. When I get home I am grumpy, angry, tired and I lay in the bed or on the couch for the entire weekend just to rest and prepare to go back to work the following week. I am seeing Dr. Landau, a psychologist, for my Post Traumatic Stress Disorder that I was diagnosed with by Dr. Seaton in January 2012 and is a result of my W/C auto accident in March 2000. Dr. Landau has expressed concerns about me driving long distances while taking pain medication and he is also concerned that my pain is not being very well managed. All of these factors are causing my PTSD to become out of control at times. I have an appointment with Dr.

5

> Landau on Monday and Dr. Mauro on Tuesday so that hopefully they can come up with a plan to better manage my pain.
>
> Can we please discuss this on Monday or Tuesday? Doctors appointment are around noon so afternoon would be best.

(Doc. 72-3) (*see also* Doc. 74-1 ¶¶ 126-133) ("September 28 fall").

When Plaintiff visited Dr. Mauro on Tuesday, October 2, 2012, Dr. Mauro prescribed the drug Hydrocodone and cautioned Plaintiff against taking it before or during work hours due to the amount of driving that he does for his job. (Doc. 74-1 ¶ 135). Dr. Mauro's corresponding office note states:

> The patient is complaining that his employer is giving him too many hours of work. Apparently, they have expanded his territory. I advised him that he is not truly on any restrictions, but I think it is reasonable to state that he should work 40 hours per week. He tells me that he is working 60 to 70 hours per week, and this is causing increasing pain and, therefore, we will place a restriction of 40 hours per week. There are no physical restrictions, it is a work time restriction.

(Doc. 73-5). This note represents the first time that any of Plaintiff's health care providers placed a restriction on the number of hours that Plaintiff should work. (*See* Docs. 71 at 89:15-90:14; 73 at 39:14-22; 78-1 ¶ 190). Plaintiff disagrees.

### IV. <u>Evaluation and Accommodation</u>

In an October 5, 2012 email, Angela Lyle, Defendant's Human Resources Director, informed Plaintiff that his September 28, 2012 email had raised safety concerns. (Doc. 72-4 at 2). She informed him that Defendant had opened an incident investigation and that he should cooperate with Cecelia Allen, Defendant's Health and Safety Manager, as part of the investigation. (*Id.*) Plaintiff was further advised that he should apply for leave under the Family Medical Leave Act ("FMLA"). (*Id.*) Ms. Lyle also advised Plaintiff "not to drive or work until further notice" because "safety is of the utmost concern to Crane." (*Id.* at 2). In an October 10, 2012 email, Plaintiff responded to Lyle, noting that Dr. Mauro had put no restrictions on his return to work, except limiting him to a forty hour work week, prescribing Hydrocodone and instructing him to continue taking Soma. (*See id.* at 2). Plaintiff also stated, "I would like to request a reasonable accommodation under the Americans with

Disabilities Act (ADA) which would allow me to do my job in a 40 hour work week. Please let me know what steps I need to take to get back to work." (*Id.* at 2). That day, Lyle responded by email stating, "[t]o be clear, everyone supports the 40 hour work week and you and Dave [Melvin] need to work together on this end." (*Id.* at 1). She also noted, "[a]s pertains to when you can return to work, that is a current investigation, based on the incident you outlined in your previous email. While the doctor has not put you on any restrictions. . . . Clearly we cannot have someone who claims to be heavily medicated working in any capacity so there needs to be resolution before you can return to work." (*Id.* at 1).

On October 30, 2012, Graham Boyd, Defendant's Vice President of Human Resources, contacted Plaintiff by email. (Doc. 72-6). Therein, Boyd advised Plaintiff that Plaintiff was prohibited from returning to work as an FSE and driving any company-owned vehicle "until such time as your treating physician . . . has provided sufficient documentation that you are once again fit and able to drive safely." (*Id.* at 1). Further, Boyd stated, "to the extent that you are otherwise able to return to work before you are able to drive (as an essential function of your job), you are more than welcome to contact me about the availability of other open and available positions for which you may be qualified." (*Id.* at 2). On a facsimile transmission dated October 30, 2012, and referring to a fitness-for-duty certification form sent by Defendant, Dr. Mauro's nurse wrote that Dr. Mauro declined to complete the form because Plaintiff was not taken off work by Dr. Mauro and Plaintiff had no physical restrictions. (Doc. 74-1 ¶ 144). In addition, Dr. Mauro wrote that Plaintiff "is not disabled" and "has no restrictions." (*Id.* ¶ 145). On November 1, 2012, Dr. Mauro submitted the fitness-for-duty certification, indicating that Plaintiff could return to work on October 8, 2012 but should be limited to a 40 hour work week. (*Id.* ¶ 146). The fitness-for-duty certification, however, did not address whether Plaintiff's medications would cause difficulty in driving or cause him to pose a risk to others while driving. (*Id.* ¶ 147). Nor is there record evidence indicating why the form was sent to Defendant on November 1, 2012 but indicated that Plaintiff could return to work as of October 8, 2012. (*Id.* ¶ 148).

7

In a November 7, 2012 letter, Cecelia Allen asked Plaintiff to contact Dr. Mauro's office within seven days and provide written clarification regarding, "whether the side effects of the medications would cause difficulty in driving or otherwise pose any risk to you or others while driving." (*Id.* ¶ 149). In that letter, Allen also asked Plaintiff to allow Defendant to contact Dr. Mauro directly for the purpose of obtaining clarification regarding the effects of his medication. (*Id.* ¶ 150). On November 7, 2012, David Carnley, a workers' compensation field manager assigned to Plaintiff's case by Coventry Health Care, wrote to Dr. Mauro and asked that he address, "whether or not at this point [Plaintiff] should take the narcotic pain medication during a 8 hour workday given his operation of a motor vehicle." (*Id.* ¶ 151). On November 9, 2012, Dr. Mauro responded to Carnley and stated, "I agree – narcotic may cause sedation – each patient is different – only [Plaintiff] can tell us. Ask pt. to put in writing his reaction to meds." (*Id.* ¶ 152). On November 9, 2012 Allen wrote Plaintiff again and noted that Dr. Mauro requested that Plaintiff place his reactions to his medications in writing and further asked that Plaintiff provide that information. (*Id.* ¶ 153). Plaintiff does not recall ever providing, in writing, to either Defendant or Dr. Mauro, his reactions to his medications. (*Id.* ¶ 154).

On November 19, 2012, Plaintiff wrote Cecelia Allen and informed her that the Hydrocodone prescribed by Dr. Mauro made him drowsy. (*Id.* ¶ 155). On December 1, 2012, and after receiving a release from Plaintiff, Allen wrote to Dr. Mauro, attached Plaintiff's job description and asked that he complete a questionnaire certification regarding Plaintiff's abilities to perform his FSE job functions. (*See id.* ¶ 157). Dr. Mauro has no recollection of ever completing the questionnaire. (*Id.* ¶ 158). Ms. Allen did not receive a response to her December 1, 2012 correspondence to Dr. Mauro until Tuesday February 5, 2013. (*Id.* ¶ 159).

In a letter dated December 6, 2012 and addressed to Cecelia Allen, Dr. Mauro opined, "[Plaintiff] can return to his normal regular duty work . . . despite him being on Hydrocodone. We must rely upon the patient as to the side effects, and this patient denies any side effect, including sedation, drowsiness or cognitive suppression." (Doc. 73-8 at 3). Dr. Mauro noted, however, "[t]he only restriction we have placed on him is that he is to only

work 40 hours per week. . . ." (Doc. 73-8 at 3). While Dr. Mauro alleges that he dictated his response to Allen's request on December 6, 2012, it was not faxed to Ms. Allen until February 5, 2013. (Doc. 74-1 ¶ 160).

On February 11, 2015, Mr. Melvin contacted Plaintiff and let him know that he had been released to return to work. (*Id.* ¶ 161). In response, Plaintiff asked that his return to work be delayed until February 18, 2013 due to an illness. (Doc. 72-12). In a February 14, 2013 letter to Plaintiff, Cecelia Allen noted, "[a]s you prepare to return to your duties at Crane, please know that we are committed to helping you to limit your work time to forty hours per week in accordance with your health care provider's instructions." (Doc. 72-13). Plaintiff currently works a full time schedule, as close to forty hours each week as possible, absent a brief illness or planned vacation. (Doc. 78-1 ¶ 226).

Plaintiff returned to work on or about February 18, 2013 and has worked continuously as an FSE since then. (*See* Doc. 74-1 ¶ 167). Defendant has let him know that the company wants him to adhere to his requested forty (40) hour per week limitation. (*Id.* ¶ 168). Since at least February 18, 2013, no one within Defendant's company has either insisted or required that Plaintiff work more than 40 hours per week. (*Id.* ¶ 173).

## V.   Plaintiff's EEOC Charges

On March 20, 2012, Plaintiff filed his March EEOC Charge against Defendant with the EEOC, alleging a failure to promote plaintiff to the position of Senior FSE and retaliation under the Americans with Disabilities Act. (Doc. 72-14). In either March or April, 2012, Mr. Melvin, Angela Lyle, and Cecelia Allen learned that Plaintiff filed his March EEOC Charge. (*See* Docs. 70 at 50:16- 51:8, 65 at 59:13-21). On October 18, 2012, after being placed on involuntary leave pending Defendant's incident investigation, Plaintiff filed the October EEOC Charge against Defendant with the EEOC, alleging that Defendant retaliated against him for filing the March EEOC Charge by placing him on unpaid FMLA leave after his September 2012 fall. (Doc. 72-15).

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of fact "is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or show that there is some metaphysical doubt as to the material facts." *Matsuhita*, 475 U.S. at 586 (citations and internal quotations

omitted). Instead, the nonmovant must point to evidence in the record that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form") (quotation omitted). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

## DISCUSSION

Plaintiff brings claims against Defendant for unlawfully retaliating and discriminating against him by: 1) denying his requests to limit his work schedule to 40 hours per week by changing his geographical territory; and 2) failing to promote him to the Senior FSE position, in violation of the Americans with Disabilities Act, as amended, 12 U.S.C. § 12101, *et seq.*, ("ADA"). (*See generally* Doc. 28). Under the ADA, it is unlawful for an employer to discriminate against "'a qualified individual with a disability because of the disability of such individual in regard to . . . advancement, or employee compensation, and other terms, conditions, and privileges of employment.'" *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) (quoting 42 U.S.C. § 12112(a)).

### I. Count I – Disability Discrimination Claim

#### A. Failure to Promote

The failure to promote claim in Plaintiff's Amended Complaint is time-barred and thus not actionable in this case. A charge under the ADA must be filed with the EEOC "within one hundred eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also Salser v. Clarke County School District,* No. 3:10-CV-17-CDL, 2011 WL 56064, at *2 (M.D. Ga. Jan. 5, 2011) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)). Therefore, any allegedly unlawful acts that occurred prior to 180–days before the filing of an EEOC charge are untimely filed and no longer actionable. *Salser,* 2011 WL 56064, at *2. The record shows that Plaintiff filed his March EEOC Charge on

March 20, 2012.  Accordingly, any allegedly unlawful acts that occurred prior to September 22, 2012 are time barred and thus not actionable in this case.

Plaintiff claims that Defendant failed to promote him to the position of Senior FSE because of his disability, despite his repeated requests.  (Doc. 28 ¶ 9-10).  According to Plaintiff, in January, 2011, David Melvin promised to promote him to the position of Senior FSE if he taught an advanced training class.  (Doc. 78-1 ¶¶ 234, 235).  Plaintiff alleges that "in or about January 2011, Plaintiff taught the advanced class, but he still has not been promoted."  (Doc. 28 ¶¶ 9, 10).  Generally, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113.  Facts supporting a discrimination claim based on a failure to promote are discrete acts and thus not actionable if they occur outside of the relevant period.  *See id.*, 536 U.S. at 114 (discrete acts include "termination, *failure to promote*, denial of transfer, or refusal to hire." (emphasis added); *Salser*, 2011 WL 56064, at * ("A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within … 180 … days of the date of the act or lose the ability to recover for it.").

Here, Plaintiff does not allege, and there is no evidence showing, that any of the facts on which his failure to promote claim is based occurred on or after September 22, 2012.  Accordingly, Plaintiff's failure to promote claim under the ADA is time-barred and thus not actionable in this case.

### B. Reasonable Accommodation Requests

Plaintiff also alleges that, following his 2000 car accident, "Plaintiff's doctors released him to limited duty of working no more than forty hours per week. . . . [yet] Defendant has required Plaintiff to work hours in excess of this limitation."  (Doc. 28 at 2).  In 2007, upon the departure of FSE Don Seay, Plaintiff took over Seay's territory, which included Georgia, Florida, and Alabama.  Plaintiff testified that Steve Friedman,[3] Mike Cano, David Melvin, and Angela Lyle subsequently "increased [his] territory, which requires [him] to work more

---

[3] Steve Friedman was employed as Defendant's Regional Vice President from 2000 until 2009, when he left the company.  (*See* Docs. 71 at 51:17-20; 74-1 ¶ 48).

hours to do more work" and that, Angela Lyle told him that "[he] was expected to work overtime whether [he] had a doctor's excuse or not." (Doc., 71 at 91:8-11). However, to the extent that these persons failed to accommodate Plaintiff's disability, the evidence indicates that these denials took place before September 22, 2012. Friedman left the company in 2009 and Cano only supervised Plaintiff from 2006 until 2011. Further, Plaintiff testified that his conversation with Angela Lye occurred in either 2010 or 2011.[4] Accordingly, Plaintiff's ADA claims related to his 40-hour-per week limitation and territory expansion prior to September 22, 2012 are time-barred and thus not actionable.

The continuing violation doctrine "allows a plaintiff to sue on otherwise time-barred claims where at least one violation occurred within the [limitations] period." *Wolf v. MWH Constructors, Inc.*, 34 F. Supp.3d 1213, 1222 (M.D. Fla. 2014). The doctrine is grounded in "the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1222 (11th Cir. 2001). The only evidence of a request for a 40 hour work week within the limitations period is the email sent by Plaintiff on September 28, 2012. This email resulted in a human services investigation culminating with Defendant's agreement to limit Plaintiff's work week to 40 hours. During the pendency of the investigation, Plaintiff was on FMLA leave. Because the September 28, 2012 email resulted in the accommodation sought, no violation occurred during the limitations period.

## II.  Count II – Retaliation Claim

Plaintiff alleges that Defendant retaliated against him by: 1) failing to promote him to Senior FSE because he requested a reduction in his territory after his 2000 car accident; and (2) placing him on unpaid, involuntary leave after his September 28 fall because he filed his March, 2012 EEOC charge. (*See* Docs. 28 ¶¶11, 12, 23-29; 78 at 17-21). The ADA's antiretaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or

---

[4] *See* Doc. 74-1 ¶ 34.

13

because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." § 12203(a). "[W]e assess ADA retaliation claims under the same framework we employ for retaliation claims under Title VII." *Stewart v. Happy Herman's Chershire Bridge, Inc.* 117 F.3d 1278, 1287 (11th Cir. 1997) (applying the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)). To avoid summary judgment, a plaintiff must establish a prima facie case, which raises a presumption that the employer's decision was more likely than not based on an impermissible factor. *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995). To establish a prima facie case for retaliation under the ADA, the plaintiff must show "(1) he engaged in a statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the adverse action and his protected expression." *Lucas*, 257 F.3d at 1260, *Standard v. A.B.E.L.*, 161 F.3d 1318, 1328 (11th Cir. 1998).

### A. Failure to Promote

Plaintiff fails to allege a prima facie case with regard to the failure to promote claim as the evidence establishes that he did not suffer an adverse employment action. Plaintiff engaged in protected expression by requesting an accommodation of a reduction in territory after his 2000 car accident, but he fails to allege that, within the actionable time period – from September 28, 2012 through the filing of the action – that he was passed over for a promotion to a Senior FSE position. According to Defendant's Undisputed Statement of Facts[5], there were no Senior FSE positions available in Plaintiff's region during the actionable time period. (Doc. 74-1 ¶¶ 66-73). In March or April of 2012, a Senior FSE in South Texas resigned, and Defendant assigned Lange to take over the South Texas territory. (*Id.* ¶¶ 68-73). In order to accept the position, Lange took a demotion from quality/test engineer to Senior FSE. (*Id.* ¶ 73). As no promotions to Senior FSE have been available in the actionable time period, Plaintiff suffered no adverse action by not being promoted to a non-existent positon. Accordingly, Plaintiff fails to establish a prima facie case for retaliation

---

[5] Pursuant to the M.G. Ga. L.R. 56, "All material facts contained in the Movant's statement which are not specifically controverted by specific citation to particular parts of the materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." As Plaintiff failed to controvert the following statements at all, let alone through a citation to the record, these facts are deemed admitted.

for requesting an accommodation after his 2000 car accident, his claim fails as a matter of law.

### B. Retaliation for Filing March EEOC Charge

Plaintiff also fails to establish a prima facie case of retaliation related to the filing of the March EEOC Charge. Plaintiff engaged in protected expression under the ADA by filing his March EEOC Charge in 2012, and being placed on involuntary leave without pay qualifies as an adverse action. But, Plaintiff's retaliation claim fails because there is no evidence of a causal link between the adverse action and his protected expression.

To prove this causal connection, a plaintiff need only demonstrate "that the protected activity and the adverse action were not wholly unrelated." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (internal citation and quotation marks omitted). "A plaintiff establishes this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct and that there was close temporal proximity between this awareness and the adverse employment action." *Id.* Under Eleventh Circuit precedent, even a three month disparity between the protected activity and the adverse employment action is too long as a matter of law to infer causation. *See Bailey v. City of Huntsville*, 517 F. App'x 857, 861 (11th Cir. 2013) (three month gap insufficient); *Garrett v. University of Alabama at Birmingham Bd. of Trustees*, 507 F.3d 1306, 1317 (11th Cir. 2007) (four month gap insufficient). As Plaintiff was placed on involuntary leave in September, 2012 – approximately 5 months after Defendant learned that Plaintiff filed his March EEOC Charge in 2012 – there is no temporal proximity for a reasonable jury to infer causation. Accordingly, Plaintiff fails to establish a prima facie case for retaliation for filing his March EEOC Charge.

Even if Plaintiff could establish a causal connection between his March EEOC Charge and his involuntary leave, Plaintiff fails to rebut Defendant's legitimate, non-retaliatory reason for placing him on leave. If a plaintiff makes out its prima face case, the burden shifts to the defendant to offer "legitimate non-discriminatory reasons for its actions that negate the inference of retaliation." *Stewart*, 117 F.3d at 1287. Defendant argues that it could not allow Plaintiff to return to work until it received Dr. Mauro's certification that

Plaintiff's medication would not cause him to pose a danger to himself or others while performing the essential function of driving for extended periods as an FSE. In Plaintiff's email to Mr. Melvin after his September 28 fall, Plaintiff stated, "I had to take my medication this morning as it was impossible for me to *drive or function without it*. . . . Dr. Mauro has prescribed me some new pain medication that makes me very loopy feeling which may have caused the fall. . . ." (Doc. 76-6) (emphasis added). Accordingly, Defendant has set forth a legitimate, non-discriminatory reason for its decision to place Plaintiff on leave.

When a defendant carries this burden, then the plaintiff must show that "it will be able to establish at trial that the employer's proffered non-discriminatory reason[] [is] a pretextual ruse designed to mask retaliation." *Id.* A plaintiff may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, (1981). A plaintiff may point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in a defendant's proffered reason. *Brooks V. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citation omitted). However, a plaintiff cannot merely dispute the wisdom of the proffered reason, but "must meet that reason head on and rebut it." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Furthermore, a reason is not pretext for discrimination unless it is shown that the reason was false and that discrimination was the real reason. S*t. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).

Plaintiff argues that Defendant's proffered reason is pretextual because "[t]here is still no evidence that would give Defendant a reasonable belief that Plaintiff ever performed any work for Defendant while experiencing medication side effects." (Doc. 78 at 20). The record shows that on the day of his fall, he had just returned home from work and was unloading his truck. In his letter to Mr. Melvin, he admits that that he had taken his medication that morning and that he suspected that it made him feel loopy and likely caused his fall. By merely quarreling with the wisdom of the proffered reason, Plaintiff has failed to "meet that reason head on and rebut it." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). *See also Burdine*, 450 U.S. 248, 256, (1981); *Stewart*, 117 F.3d at 1287.

Accordingly, Plaintiff's retaliation claim related to the March EEOC Charge fails as a matter of law.

### III. Reasonable Costs and Attorneys' Fees

In its Motion for Summary Judgment, Plaintiff requests that the Court grant Defendant reasonable costs and attorneys' fees. (Doc. 74 at 1). Upon review, Defendant has articulated no basis for its request. Accordingly, Defendant shall take no costs or attorneys' fees from the Court's ruling.

### CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment, (Doc. 74), is **GRANTED**,

**SO ORDERED**, this  29th  day of September, 2016.

/s/ Leslie J. Abrams
**LESLIE J. ABRAMS, JUDGE**
**UNITED STATES DISTRICT COURT**